

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
04/02/2014

| | | |
|---|---|---|
| IN RE: § | | |
| TTC PLAZA LIMITED PARTNERSHIP § | CASE NO: 11-38381 | |
| Debtor(s) § | | |
| § | CHAPTER 7 | |
| § | | |
| RANDY W. WILLIAMS § | | |
| Plaintiff(s) § | | |
| § | | |
| VS. § | ADVERSARY NO. 13-03261 | |
| § | | |
| CHUNG HUA WU, *et al* § | | |
| Defendant(s) § | | |

## MEMORANDUM OPINION

Defendants' Motion for Summary Judgment is denied as to Plaintiff's claims under Tex. Bus. & Comm. Code, § 24.005(a)(2)(A) and § 24.006(a).  Defendants' Motion for Summary Judgment is granted as to Plaintiff's claim under § 24.005(a)(2)(B).

### Background

Randy Williams, chapter 7 Trustee, filed an amended complaint, seeking to recover certain transfers made by the Debtor, TTC Plaza, LP, against Defendants Chung Hua Wu, United Wu, LP, Mundo Mex, Inc., Mohamed A. Sohani, and Harwin Bintliff Center, Inc., Barney River Investments, Inc., Hussainali Ali, Zubee 786 Investment, Inc., and Zubeda Ali.

A trial solely on the issue of insolvency is scheduled for April 17, 2014 at 9:00 a.m. (Case No. 13-03261, ECF No. 31 at 2).  The Scheduling Order provides that the parties may file dispositive motions on the issue of insolvency not later than March 24, 2014.  (ECF No. 31 at 2). On February 24, 2014, Defendants Mohammed A. Sohani and Harwin Bintliff Center filed this motion for summary judgment.  (ECF No. 33).  Defendants allege that TTC was not insolvent on

April 15, 2009, the date of the transfer forming the basis of Mr. Williams' claims against Defendants.

## Facts

The general partner of TTC Plaza (Debtor) was Mundo Mex, Inc. Defendant, Chung Hua ("Wu"), was the President, Director, and sole shareholder of Mundo Mex. TTC Plaza owned a retail strip center located at 7250 Harwin Drive, Houston, Texas (the "Harwin Retail Center").

On May 26, 2006, TTC Plaza sold the Harwin Retail Center to Harwin Bintliff Center ("HBC"). Defendant, Mohammed Sohani, is the President, Director, and shareholder of HBC. As part of the sale, HBC executed a promissory note payable to TTC Plaza in the amount of $790,000.00 (the "Harwin Note"). Mr. Sohani also personally executed another promissory note payable to TTC Plaza in the amount of $300,000.00 (the "Sohani Note"). Both notes were secured by a deed of trust in the Harwin Retail Center.

On June 16, 2006, Wu caused New Vargo, LLC ("New Vargo") to be formed to purchase, own, and operate Vargo's Restaurant. Wu served as an officer, director, and shareholder of the company. On June 23, 2006, TTC Plaza purchased the real property and improvements located at 2401 Fondren Drive, Houston, Texas 77063, which had been the site of Vargo's Restaurant since 1965. TTC Plaza financed its purchase by executing a promissory note payable to Capital One in the amount of $4,998,000.00. TTC Plaza leased the property to New Vargo for its operation of Vargo's Restaurant.

On April 15, 2009, TTC settled the Sohani Note by accepting a lump sum payment of $193,000.00 from HBC. At the time of the settlement, the Sohani Note had a balance of approximately $288,252.26.

On March 3, 2011, TTC Plaza sold the Harwin Note to Barney River Investments, Inc. and Zubee 786 Investment, Inc. for a sum of $250,000.00, and TTC Plaza retained the option to repurchase the note at any time prior to March 1, 2012 for $420,000.00. At the time of the sale, the Harwin Note had a balance of approximately $730,583.00.

Hussainali A. Ali (Defendant) is the president, director, and shareholder of Barney River. Zubeda K. Ali (Defendant) is the president, director, and shareholder of Zubee.

In September 2011, New Vargo was financially unable to operate the restaurant business and it abandoned its lease with TTC Plaza.

In the fall of 2011, Capital One refused to renew the Capital One Note owed by TTC Plaza and it noticed a foreclosure sale of Vargo's Restaurant for October 4, 2011. On the eve of the foreclosure sale, TTC filed its voluntary petition under Chapter 11 of the Bankruptcy Code.

On May 22, 2012, HBC paid $525,000 to Barney River and Zubee in full satisfaction of the Harwin Note.

## Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Fed. R. Bankr. P. 7056 incorporates Rule 56 in adversary proceedings.

A party seeking summary judgment must demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) an absence of a genuine dispute of material fact. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006). A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

A court views the facts and evidence in the light most favorable to the non-moving party at all times. *Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009). Nevertheless, the Court is not obligated to search the record for the non-moving party's evidence. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact.[1] Fed. R. Civ. P. 56(c)(1). The Court need consider only the cited materials, but it may consider other materials in the record. Fed. R. Civ. P. 56(c)(3). The Court should not weigh the evidence. A credibility determination may not be part of the summary judgment analysis. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). However, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2).

"The moving party bears the burden of establishing that there are no genuine issues of material fact." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008). The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence that would entitle the movant to judgment at trial. *Malacara*, 353 F.3d at 403. Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine dispute of material fact. *Sossamon*, 560 F.3d at 326. The non-moving party must cite to specific evidence

---

[1] If a party fails to support an assertion or to address another party's assertion as required by Rule 56(c), the Court may (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if, taking the undisputed facts into account, the movant is entitled to it; or (4) issue any other appropriate order. Fed. R. Civ. P. 56(e).

demonstrating a genuine dispute. Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Cattrett*, 477 U.S. 317, 324 (1986). The non-moving party must also "articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004). Even if the movant meets the initial burden, the motion should be granted only if the non-movant cannot show a genuine dispute of material fact.

If the non-movant bears the burden of proof of an issue, the movant must show the absence of sufficient evidence to support an essential element of the non-movant's claim. *Norwegian Bulk Transp. A/S*, 520 F.3d at 412. Upon an adequate showing of insufficient evidence, the non-movant must respond with sufficient evidence to support the challenged element of its case. *Celotex*, 477 U.S. at 324. The motion should be granted only if the non-movant cannot produce evidence to support an essential element of its claim. *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

## Summary of Relevant Transactions with HBC and Mr. Sohani

The Sohani Note was executed between Mr. Sohani and TTC on May 26, 2006 in connection with HBC's purchase of the Harwin Retail Center. The principal amount of the loan was $300,000.00, amortized over 30 years with a 10 year maturity. Monthly payments were $1,798.65 with a final principal payment $251,057.17 at maturity.

The transfer forming the basis of this claim was TTC's settlement of the Sohani Note, which occurred on April 15, 2009. TTC settled the note by accepting a lump sum payment of $193,000.00 from HBC. At the time of the settlement payment, the note had a principal balance of $288,252.26.

Mr. Williams asserts that the settlement of the Sohani Note was a fraudulent transfer made in violation of Tex. Bus. & Comm. Code § 24.001 *et seq.*, an action the Trustee may assert

pursuant to 11 U.S.C. § 544(b)(1). Mr. Williams seeks to recover $95,252.26, the difference between the principal owed on the promissory note and the value TTC received for settling the note on April 15, 2009. (ECF No. 10 at 3-4).

Mr. Sohani and HBC contend that Plaintiff's claims under § 24.005(a) and § 24.006(a) fail as a matter of law. They argue that:

- TTC was not engaged or about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

- TTC did not intend to incur, or believe or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

- TTC was not insolvent at the time of the transfer or became insolvent as a result of the transfer.

**A. Tex. Bus. & Comm. Code 24.005(a)(2)**

A claim under section § 24.005(a)(2) of the Texas Business & Commerce Code requires a plaintiff to prove that at the time of the alleged transfer the debtor:

A. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction *or*

B. Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Tex. Bus. & Comm. Code, § 24.005(a)(2).

Neither TUFTA nor the Bankruptcy Code defines "unreasonably small" in regard to a debtor's capital structure. Other courts, including one in this District, have held that "unreasonably small assets" denotes a financial condition short of insolvency. *See ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 396 (S.D. Tex. 2008); *See also MFS/Sun Life Trust—High Yield Series v. Van Dusen Airport Servs. Co.,* 910 F.Supp. 913, 944 (S.D.N.Y.1995) (interpreting fraudulent transfer provisions of Delaware, New York, and Minnesota). A debtor is

deemed to have unreasonably small capital at the time of the transfer if it is generally unable to generate enough cash flow to sustain operations. *See Moody v. Security Pacific Business Credit, Inc.,* 971 F.2d 1056, 1070 (3rd Cir.1992). Although short of technical insolvency, a debtor's unreasonably small capital structure is presumed to lead eventually to insolvency. *See In re Vadnais Lumber Supply, Inc.,* 100 B.R. 127, 137 (Bankr.D.Mass.1989). *In re Pioneer Home Builders, Inc.*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992). The test is whether the unreasonably small capital condition and consequent cash flow problems were reasonably foreseeable when viewed objectively at the time of the transaction at issue. *In re WRT Energy Corp.*, 282 B.R. 343, 411 (Bankr. W.D. La. 2001).

There is a genuine issue of material fact as to whether TTC was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction. In this case, the proper valuation of each substantial TTC asset is in dispute. Based on this alone, the Court cannot grant summary judgment as to whether TTC had unreasonably small assets in relation to its business. The proper valuations for each asset are fact issues for trial.

TTC's largest asset was its real property, which was worth somewhere between $5,850,000.00 and $6,780,000.00. TTC's only substantial liability was its $4,998,000.00 promissory note payable to Capital One, secured by a deed of trust on the real property.

Defendants admit that "[t]he Debtor relied on New Vargo's ability to pay its rent in order for the Debtor to pay its mortgage to Capital One." (ECF No. 33 at 4). Defendants argue that TTC "continued to own and lease the Vargo Property to New Vargo for a steady revenue stream" and that it "could not reasonably have believed that it would not be able to pay the Capital One Note as it became due until New Vargo defaulted on its rent in the Spring of 2011." (ECF No. 33

at 10). Mr. Williams disputes the fact that New Vargo was current on its rent obligations as of April 15, 2009.

According to the March 31, 2009 balance sheet, New Vargo owed TTC $471,543.26. Mr. Williams alleges that this amount represents past rent due to TTC. If Mr. Williams is correct, then New Vargo would have failed to make all payments due on its lease *before* April 15, 2009. The December 31, 2010 balance sheet indicates that New Vargo owed TTC $770,784.86. This suggests that TTC failed to collect a large percentage of the rental income owed by New Vargo in the months following the April 15, 2009 transaction.

As for § 24.005(a)(2)(B), no evidence has been presented that on April 15, 2009, TTC intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due. In fact, there is no evidence that TTC incurred any significant debt after the April 15, 2009 transfer. TTC's only substantial liability was the $4,998,000.00 promissory note payable to Capital One, which was incurred in June of 2006.

There is a genuine issue of material fact as to TTC's undercapitalization as of April 15, 2009. Accordingly, defendants' motion for summary judgment on Mr. William's claim under Tex. Bus. & Comm. Code, § 24.005(a)(2)(A) is denied. The motion is granted as to § 24.005(a)(2)(B).

### B. Tex. Bus. & Comm. Code 24.006(a)

To establish a claim under Tex. Bus. & Comm. Code, § 24.006(a), the Plaintiff must prove that the Debtor was insolvent at the time of the transfer or the Debtor became insolvent as a result of the transfer. Section 24.003 defines "insolvency" for purposes of the TUFTA. The relevant portions of that section are:

(a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.

> (b) A debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent.

Tex. Bus. & Comm. Code, § 24.003.

Mr. Williams' insolvency argument focuses on part (a), which parallels the Bankruptcy Code's approach to insolvency. Tex. Bus. & Com.Code Ann. § 24.003. The Code defines insolvency as a "financial condition such that the sum of [the] entity's debts is greater than all of [its] property, at a fair valuation ..." 11 U.S.C. § 101(32)(2002). Courts refer to this test as a balance sheet test, and engage in the "fair valuation" of the debts and property shown on the debtor's balance sheet. *In re Lamar Haddox Contractor, Inc.,* 40 F.3d 118, 121 (5th Cir.1994). However, a fair valuation may not be equivalent to the book values assigned on a balance sheet. *Haddox,* 40 F.3d at 121. The insolvency evaluation through the balance sheet analysis should include consideration of the Debtor as a "going concern" and asset values associated with such a classification. *Weaver v. Kellogg*, 216 B.R. 563, 576 (S.D. Tex. 1997).

"A debtor's insolvency at time of an alleged fraudulent transfer requires a *fact-intensive determination* based on bankruptcy court's review of debtor's financial records and status at time of transfers." *In re Hung*, 387 B.R. 766 (Bankr. N.D. Iowa 2008). To perform the balance sheet insolvency test, courts conduct a two-step analysis. The court first determines whether the debtor was a "going concern" or was "on its deathbed." *In re Brentwood Lexford Partners, LLC*, 292 B.R. 255, 268 (Bankr. N.D. Tex. 2003). The court must then value the debtor's assets, depending on the status determined in the first inquiry, and apply the balance sheet test to determine whether the debtor was solvent. *Id*. For a debtor that was a going concern, the court would "determine the fair market price of the debtor's assets as if they had been sold as a unit, in a prudent manner, and within a reasonable time." *Id*. As a going concern, the debtor would not

likely face a forced sale. Accordingly, a fair market valuation best determines a fair market price. The Fifth Circuit has instructed that the fair value of property is determined "... by 'estimating what the debtor's assets would realize if sold in a prudent manner in current market conditions.'" *Brentwood Lexford,* 292 B.R. at 268 (citations omitted).

In reaching its conclusions on "fair valuation," this Court may adopt the asset values of one party or the other, or the Court may choose its own fair valuation figure after weighing all the evidence. *See, e.g., Roblin Indus.,* 78 F.3d at 35 (stating that if possible, insolvency determinations should be based on seasonable appraisals or expert testimony, but that "[b]ecause the value of property varies with time and circumstances, the finder of fact must be free to arrive at the 'fair valuation' defined in § 101[(32)] by the most appropriate means.").

## Insolvency Analysis

Defendants rely on TTC's financial statements to argue that TTC was not insolvent as of April 15, 2009. "The Debtor's financial statements show that the Debtor was not insolvent on April 15, 2009. There is no genuine issue of material fact as to insolvency, and the Debtor is entitled to judgment as a matter of law on the Plaintiff's claim under Tex. Bus. & Comm. Code, § 24.006(a)." (ECF No. 33 at 12). Defendants contend that TTC's March 31, 2009 Balance Sheet, which states that TTC's assets exceeded its liabilities by $2,001,427.38, accurately reflects its assets and liabilities as of April 15, 2009. Mr. Williams has raised fact issues as to the accuracy of the balance sheets relied upon by the defendants in this case.

Mr. Williams prepared a written report regarding TTC's solvency over the April 15, 2009 to September 2011 timeframe. (ECF No 36-2). Mr. Williams stated that "it is my opinion that the Debtor was insolvent at the time each transfer was made." (ECF No 36-2 at 1). With regards to the relevant transfer ("Sohani Note"), Trustee argues that five adjustments from the March 31,

2009 Balance Sheet must be made in order to accurately reflect the value of TTC's assets as of April 15, 2009. If Mr. Williams can prove that these adjustments are appropriate, he may prove that TTC was balance sheet insolvent as of April 15, 2009.

   1. **Value of TTC's Real Property**

TTC owned the real property and improvements located at 2401 Fondren Drive, Houston, Texas 77063, the site where Vargo's Restaurant operated. Trustee proposes that the value of the Vargo's Property should be reduced from $6,780,000.00 to $5,850,000.00, the amount actually realized from sale of the property. (ECF No 36-2 at 2).

Defendants' own statement suggests that the $6,780,000.00 amount listed on the March 31, 2009 Balance Sheet is too high: "[t]he fair market value of the Vargo's Property was in excess of at least $6,000,000.00 as evidence by the tax assessor's valuation of that property from the date of its purchase by the Debtor through the end of 2011." (ECF No. 33 at 3).

After TTC filed its chapter 11 case, TTC and Capital One entered into an Agreed Order where TTC was given until April 7, 2012 to sell the property. (ECF No. 36-2 at 2). By the April 7, 2012 deadline, the property had not been sold and the bankruptcy case was converted to chapter 7 on April 10, 2012. On April 18, 2012, Mr. Williams (the appointed Trustee) filed a motion to sell the property to the highest qualified bidder for the purchase price of $6,125,000.00 (Case No. 11-38381, ECF No. 68). The purchaser's plan was to construct a five story 312 unit apartment complex on the property. Unfortunately, the Lake Vargos' Home Owners Association refused the purchaser's request for an ingress/egress to the property. Mr. Williams argues that although this was not discovered until after a purchaser was identified, the ingress/egress problem had existed at least as far back as April 15, 2009. (ECF No. 36 at 6). This required the

purchaser to reduce the scope of its project, and ultimately caused a reduction in the final purchase price from $6,125,000.00 to $5,850,000.00.

Mr. Williams relies on the following evidence to support his opinion that the value of the property was $5,850,000.00 on April 15, 2009:

> (i)  The property was actively marketed by a broker for six months after the petition date and no higher qualified bids were received.
>
> (ii) The original purchase price obtained for the property was generally consistent with the tax appraisals for the years 2009 to 2011.
>
> (iii) The final purchase price was reduced due to the homeowners association's rights which were not accounted for by tax appraisers or other interested bidders.
>
> (iv) The commercial real estate market in Houston was generally worse in 2009 and improved over time as the economy recovered from the recession that began in the third quarter of 2008.

(ECF No. 36-2 at 3).

Accordingly, Mr. Williams has demonstrated that there is a genuine issue of material fact as to the proper valuation of the Vargo's Party.

### 2. New Vargo Accounts Receivable

Mr. Williams proposes to eliminate the "New Vargo Accounts Receivable" asset valued at $471,543.26 because TTC never collected on this accounts receivable. (ECF No 36-2 at 5). Mr. Williams contends that this accounts receivable reflects the amount of past rent owed by New Vargo to TTC.

Based on the financial statements provided to the Court, it appears that TTC never collected on this accounts receivable. The March 31, 2011 balance sheet shows that the "New Vargo Accounts Receivable" amount increased to $835,784.00 over a two year period. (ECF No. 36-5). This asset was not listed on TTC's bankruptcy schedules when it filed its chapter 11 case on October 3, 2011. (Case No. 11-38381, ECF No. 1). These facts provide evidence that

TTC never collected any amount on this accounts receivable and that this asset may have been worth significantly less than $471,543.26.

Accordingly, there is a genuine issue of material fact as to whether and to what extent the "New Vargo Accounts Receivable" asset should be adjusted downward.

3. **New Vargo Note Receivable**

Mr. Williams proposes to eliminate the "New Vargo Note Receivable" asset valued at $220,000.00 because TTC never collected on this note. (ECF No 36-2 at 5).

Based on the financial statements provided to the Court, it appears true that TTC never collected on this note. The March 31, 2011 balance sheet shows that the "New Vargo Note Receivable" amount remained at $220,000.00. (ECF No. 36-5). This asset was not listed on TTC's bankruptcy schedules when it filed its chapter 11 case. (Case No. 11-38381, ECF No. 1). These facts provide evidence that TTC never collected any amount on this note receivable and that this asset may have been worth significantly less than $220,000.00.

Accordingly, there is a genuine issue of material fact as to whether and to what extent the "New Vargo Accounts Receivable" asset should be adjusted downward.

4. **Harwin Note Receivable**

In connection with the sale of the Harwin Retail Center, TTC and HBC executed a promissory note payable to TTC for $790,000.00 on May 26, 2006. The March 31, 2009 balance sheet indicates that HBC owed $762,781.85 on the note.

On March 3, 2011, TTC sold the Harwin Note to Barney River Investments, Inc. and Zubee 786 Investment, Inc. for $250,000.00, and TTC retained the option to repurchase the note at any time prior to March 1, 2012 for $420,000.00. At the time of the sale, the note had a balance of approximately $730,583.00. TTC never exercised its option to repurchase the note.

Mr. Williams argues that the value of the Harwin Note should be reduced from $762,781.85 to $197,000.00. (ECF No 36-2 at 5). He alleges that when the note was sold, TTC's bank account shows that only $97,000.00 went to TTC and another $100,000.00 was paid as principal to Capital One. (ECF No. 36-2 at 4). Mr. Williams believes that the balance of $53,000.00 was diverted to Wu or a Wu-controlled entity. *Id*. Even if Mr. Williams' belief is true, the alleged $53,000.00 transfer to Wu is irrelevant for purposes of valuing the asset. Accordingly, this does not warrant a $53,000.00 reduction.

The consideration received for sale of the note ($250,000.00 and TTC's retained option to repurchase the note) supports Mr. Williams' argument that this asset may have been worth less than its face value ($762,781.85) at the time of the transfer. On the other hand, the fact that the note was ultimately repaid in full by HBC[2] suggests that this proposed adjustment, which amounts to over a 67% reduction from the face value of the note, is excessive. If Mr. Williams prevails on the other four proposed adjustments, he may not have to prove that the *entire* $512,781.85 reduction to this asset is appropriate to establish insolvency.

Accordingly, there is a genuine issue of material fact as to whether and to what extent the "Harwin Note Receivable" asset should be adjusted downward.

5. **Sohani Note Receivable**

In connection with the sale of the Harwin Retail Center, TTC and Mr. Sohani executed a promissory note payable to TTC for $300,000.00. TTC settled the Sohani Note by accepting a lump sum payment of $193,000.00 from HBC on April 15, 2009. At the time of the settlement, the note had a principal balance of $288,252.26. Mr. Williams argues that even if TTC was not insolvent before this transfer, TTC became insolvent as a result of this transfer.

---

[2] Mr. Williams admitted that on May 22, 2012, HBC paid Barney River and Zubee the sum of $525,000.00 in full satisfaction of the Harwin Note. (ECF No. 36 at 3).

Defendants argue that TTC could not have become insolvent as a result of the settlement of the Sohani Note because HBC paid more than the present value of all future payments under the note.[3] Defendants' arrived at a present value calculation of $190,234.46 for the Sohani Note as of April 15, 2009 by performing the following present value calculation: (i) a forecasted $288,252.26 payment; (ii) discounted at a 6% rate of return; and (iii) on a future date of June 1, 2016.

Defendants did the wrong present value calculation. Defendants calculated the present value (as of April 15, 2009) of a lump sum payment of $288,252.26 to be received on June 1, 2016, discounted at a 6% rate of return. This does not represent the payment stream on the note.

The terms of the Sohani Note (executed in May 2006) required HBC to repay the principal amount of $300,000.00, at a 6% interest rate, amortized over 30 years with a 10 year maturity. Monthly payments were $1,798.65 and the final principal payment of $251,057.17 was due on June 1, 2016. (ECF No. 33-3). Accordingly, Defendants should have calculated the present value (as of April 15, 2009) of the remaining monthly payments of $1,798.65, and a final payment of $252,855.82 ($1,798.65 plus $251,057.17 balloon payment).

On April 15, 2009, TTC settled the Sohani Note by accepting a lump sum payment of $193,000.00 from HBC. At the time of the settlement, the note had a principal balance of $288,252.26. The present value of the remaining payments due under the note, at a 6% discount

---

[3] "The summary judgment shows that the Debtor was not insolvent on April 15, 2009, and the Debtor did not become insolvent as a result of the transfer on April 15, 2009. The "transfer" alleged by the Plaintiff is the Debtor's release of a total of $95,252.26 of the principal of the [Sohani Note], for which the Debtor received as consideration cash payment of the remaining balance of the [Sohani Note] in lieu of monthly payments of $1,798.65 spread out over 120 months with a balance at the end of that period. The note was not scheduled to mature until June 1, 2016. The present value of $288,252.26 as of April 15, 2009, with maturity on June 1, 2016 at a 6% rate of return was $190,234.46 (See Exhibit A-6, attached present value calculator printout). HBC paid more than present value in settlement of the [Sohani Note] - $193,000.00. The Debtor received that cash as an asset." (ECF No. 33 at 10-11)(internal citations omitted).

rate, equals the $288,252.26 balance owed as of April 15, 2009.[4] Accordingly, the parties agreed to reduce the principal amount owed under the Sohani Note by $95,252.26.

The parties' agreement to reduce the principal amount owed by $95,252.26 in lieu of a cash settlement supports the argument that the value of the Sohani Note as of April 15, 2009, should be adjusted downward. This is a fact issue for trial.

This table summarizes Mr. Williams' proposed asset adjustments:

| Asset | Stated Value | Reduced Value | Adjustment |
|---|---|---|---|
| 1. Vargo Property | $6,780,000.00 | $5,850,000.00 | ($930,000.00) |
| 2. Harwin Bintliff N/R | $762,781.85 | $250,000.00 | ($512,781.85) |
| 3. New Vargo A/R | $471,543.26 | $0.00 | ($471,543.26) |
| 4. New Vargo N/R | $220,000.00 | $0.00 | ($220,000.00) |
| 5. Mr. Sohani N/R | $289,666.23 | $193,000.00 | ($96,666.23) |

Total Asset Adjustment **($2,230,991.34)**

Stated Assets less Liabilities $2,001,427.38

**Adjusted Assets less Liabilities** **($229,563.96)**

If the court draws all reasonable inferences in the light most favorable to the nonmoving part, TTC would have been balance sheet insolvent and had $229,563.96 of liabilities in excess of its assets as of April 15, 2009. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)("In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party."). The table above also shows that Mr. Williams may not need to prevail on all five of his proposed adjustments to establish balance sheet insolvency.

---

[4] The parties have arrived at slightly different figures for the principal amount owed at the time of the transfer. Mr. Williams stated that Mr. Sohani owed **$289,666.23** in principal as of April 15, 2009.

The proper valuations for these five assets are fact issues for trial. There is a genuine issue of material facts as to whether TTC was balance sheet insolvent as of April 15, 2009.

## Conclusion

Accordingly, Defendants' motion for summary judgment is denied as to Plaintiff's claims under Tex. Bus. & Comm. Code, § 24.005(a)(2)(A) and § 24.006(a) and granted as to § 24.005(a)(2)(B). The Court will conduct a trial on the issue of insolvency on April 17, 2014 at 9:00 a.m.

An Order will be entered consistent with this Memorandum Opinion.

SIGNED **April 2, 2014.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE