
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
07/07/2014

| | | |
|---|---|---|
| IN RE: § | | |
| TTC PLAZA LIMITED PARTNERSHIP § | CASE NO: 11-38381 | |
|     Debtor(s) § | | |
| § | CHAPTER 7 | |
| § | | |
| RANDY W. WILLIAMS § | | |
|     Plaintiff(s) § | | |
| § | | |
| VS. § | ADVERSARY NO. 13-03261 | |
| § | | |
| CHUNG HUA WU, *et al* § | | |
|     Defendant(s) § | | |

## MEMORANDUM OPINION

Randy Williams, chapter 7 trustee, filed an amended complaint, seeking to recover allegedly fraudulent transfers made by the Debtor, TTC Plaza, LP against Defendants Chung Hua Wu, United Wu, LP, Mundo Mex, Inc., Mohamed A Sohani, and Harwin Bintliff Center, Inc., Barney River Investments, Inc., Hussainali Ali, Zubee 786 Investment, Inc., and Zubeda Ali. (Case No. 13-03261, ECF No. 10).

On April 8, 2014, the Court issued an order severing defendants Mohammed A. Sohani and Harwin Bintliff Center, Inc. (HBC) from this adversary proceeding. (Case No. 14-03114, ECF No. 45). On April 29, 2014, the Court approved a settlement between Randy Williams and defendants Sohani and HBC. (ECF No. 46). Accordingly, the remaining defendants in this adversary proceeding are Wu, United Wu, LP, Mundo Mex, Inc., Barney River Investments, Inc., Hussainali Ali, Zubee 786 Investment, Inc., and Zubeda Ali.

The Court held a trial on the issue of insolvency on April 17, 2014. At the beginning of the hearing, Mr. Wu stipulated that TTC was insolvent during 2010 and 2011. Defendants Barney River Investments and Zubee 786 Investment, Inc. are the only parties challenging

insolvency. The only alleged fraudulent transfer with regards to these defendants occurred on March 3, 2011. Accordingly, the Court must determine whether TTC Plaza was insolvent at the time of the March 3, 2011 transfer or if it became insolvent as a result of the transfer.

**Factual Background**

The general partner of TTC Plaza (Debtor) was Mundo Mex, Inc. Defendant, Chung Hua ("Wu"), was the President, Director, and sole shareholder of Mundo Mex. Wu also served as an officer, director, and shareholder of New Vargo.

TTC Plaza owned a retail strip center located at 7250 Harwin Drive, Houston, Texas (the "Harwin Retail Center"). On May 26, 2006, TTC Plaza sold the Harwin Retail Center to HBC. As part of the sale, HBC executed a promissory note payable to TTC Plaza in the amount of $790,000.00 (the "Harwin Note"). Mr. Sohani (president of HBC) personally executed a promissory note payable to TTC Plaza in the amount of $300,000.00 (the "Sohani Note"). Both notes were secured by a deed of trust in the Harwin Retail Center.

On June 16, 2006, Wu caused New Vargo, LLC ("New Vargo") to be formed to purchase, own, and operate Vargo's Restaurant[1]. On June 23, 2006, TTC Plaza purchased the real property and improvements located at 2401 Fondren Drive, Houston, Texas 77063, which had been the site of Vargo's Restaurant since 1965. TTC Plaza financed its purchase by executing a promissory note payable to Capital One in the amount of $4,998,000.00. TTC Plaza leased the property to New Vargo for its operation of Vargo's Restaurant.

On April 15, 2009, TTC settled the Sohani Note by accepting a lump sum payment of $193,000.00 from HBC. At the time of the settlement, the Sohani Note had a balance of approximately $288,252.26.

---

[1] Long-time Houstonians will recall Vargo's Restaurant as a premier restaurant in an idyllic location. The Court is saddened to lose this traditional landmark.

In September 2011, New Vargo was financially unable to operate the restaurant business and it abandoned its lease with TTC Plaza. In the fall of 2011, Capital One refused to renew the Capital One Note owed by TTC Plaza and it noticed a foreclosure sale of Vargo's Restaurant for October 4, 2011. On the eve of the foreclosure sale, TTC filed its voluntary petition under Chapter 11 of the Bankruptcy Code.

### March 3, 2011 Transaction with Barney River and Zubee

Hussainali A. Ali, is the president, director, and shareholder of Barney River. Zubeda K. Ali, is the president, director, and shareholder of Zubee 786 Investment, Inc.

On March 3, 2011, TTC Plaza sold the Harwin Note to Barney River Investments, Inc. and Zubee 786 Investment, Inc. Mr. Williams claims that TTC sold the Note for $250,000.00 and the defendants claim that they paid $360,000.00.[2] (ECF No. 44 at 3). At the time of the sale, the Harwin Note had a balance of $730,582.79. (Exhibit 10). TTC Plaza retained the option to repurchase the note at any time prior to March 1, 2012 for $420,000.00. TTC did not exercise its option to repurchase.

The Court only needs to determine whether TTC Plaza was insolvent or became insolvent as result of this transfer. The Court holds that TTC Plaza was balance sheet insolvent at the time of the March 3, 2011 transfer and became even more insolvent as a result of the transfer.[3]

### Insolvency Standard under Tex. Bus. & Comm. Code 24.006(a)

To establish a claim under Tex. Bus. & Comm. Code, § 24.006(a), the Plaintiff must prove that the debtor was insolvent at the time of the transfer or the debtor became insolvent as a

---

[2] According to the defendants, the Note was subsequently settled with HBC for $525,000.00 on May 22, 2012.

[3] Accordingly, the Court need not determine whether TTC "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction *or* intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due" under Tex. Bus. & Comm. Code, § 24.005(a)(2).

result of the transfer. Section 24.003 defines "insolvency" for purposes of the Texas Fraudulent Transfer Act ("TUFTA"). The relevant portions of that section are:

(a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.

(b) A debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent.

Tex. Bus. & Comm. Code, § 24.003.

Mr. Williams' insolvency argument focuses on part (a), which parallels the Bankruptcy Code's approach to insolvency. Tex. Bus. & Com.Code Ann. § 24.003. The Code defines insolvency as a "financial condition such that the sum of [the] entity's debts is greater than all of [its] property, at a fair valuation ..." 11 U.S.C. § 101(32)(2002). Courts refer to this test as the balance sheet test, and engage in the "fair valuation" of the debts and property shown on the debtor's balance sheet. *In re Lamar Haddox Contractor, Inc.,* 40 F.3d 118, 121 (5th Cir.1994). However, a fair valuation may not be equivalent to the book values assigned on a balance sheet. *Haddox,* 40 F.3d at 121. The insolvency evaluation through the balance sheet analysis should include consideration of the debtor as a "going concern" and asset values associated with such a classification. *Weaver v. Kellogg*, 216 B.R. 563, 576 (S.D. Tex. 1997).

A debtor's insolvency at the time of an alleged fraudulent transfer requires a fact-intensive determination based on bankruptcy court's review of the debtor's financial records and status at time of transfers. *See In re Hung*, 387 B.R. 766 (Bankr. N.D. Iowa 2008). To perform the balance sheet insolvency test, courts conduct a two-step analysis. The court first determines whether the debtor was a "going concern" or was "on its deathbed." *In re Brentwood Lexford Partners, LLC*, 292 B.R. 255, 268 (Bankr. N.D. Tex. 2003). The court must then value the debtor's assets, depending on the status determined in the first inquiry, and apply the balance

sheet test to determine whether the debtor was solvent. *Id*. For a debtor that was a going concern, the court would "determine the fair market price of the debtor's assets as if they had been sold as a unit, in a prudent manner, and within a reasonable time." *Id*. As a going concern, the debtor would not likely face a forced sale. Accordingly, a fair market valuation best determines a fair market price.

The Fifth Circuit has instructed that the fair value of property is determined "... by 'estimating what the debtor's assets would realize if sold in a prudent manner in current market conditions.'" *Brentwood Lexford,* 292 B.R. at 268 (citations omitted). In reaching its conclusions on "fair valuation," this Court may adopt the asset values of one party or the other, or the Court may choose its own fair valuation figure after weighing all the evidence. *See, e.g., Roblin Indus.,* 78 F.3d at 35 (stating that if possible, insolvency determinations should be based on seasonable appraisals or expert testimony, but that "[b]ecause the value of property varies with time and circumstances, the finder of fact must be free to arrive at the 'fair valuation' defined in § 101[(32)] by the most appropriate means.").

## Analysis

On April 17, 2014, the Court held a hearing solely on the issue of insolvency. Mr. Williams was the sole witness at trial. No evidence was presented to contradict Mr. William's testimony. Exhibits 1 - 48 were admitted into evidence with the exception of exhibits 25 and 26. (Joint Exhibit List). The relevant solvency valuation date for avoidance purposes is the date of the challenged transfer. *See, e.g., Harvey v. Orix Credit Alliance, Inc. (In re Lamar Haddox Contractor, Inc.),* 40 F.3d 118, 121 (5th Cir.1994). The sale of the Harwin Note is the challenged transfer in this case. (*See* Exhibit 1). The sale of the Harwin Note occurred on March 3, 2011.

The March 31, 2011 balance sheet states that TTC's assets exceeded its liabilities by $2,361,185.66. (Exhibit 10). Mr. Williams testified that six adjustments (five asset adjustments and one liability adjustment) from the March 31, 2011 balance sheet must be made to accurately reflect the value of TTC's assets and liabilities as of March 3, 2011.

Exhibit 10, prepared by Mr. Williams, shows that after accounting for his six proposed adjustments, TTC was balance sheet insolvent: its liabilities exceeded its assets by $791,680.41. (Exhibit 10). According to Mr. Williams, the adjusted column accurately reflects TTC's assets and liabilities at the time of the challenged transfer.

In order to avoid a transfer under § 24.006(a), Mr. Ogle must establish that TTC was insolvent at the time of the transfer or as a result of the transfer or obligation. *See* Tex. Bus. & Com. Code § 24.006(a). After making the appropriate adjustments to TTC's March 31, 2011 balance sheet, the Court finds that TTC was insolvent at the time of the challenged transfer and became even more insolvent as a result of the transfer.

**1. Value of TTC's Real Property**

TTC owned the real property and improvements located at 2401 Fondren Drive, Houston, Texas 77063, the site where Vargo's Restaurant operated. Mr. Williams testified that the value of the Fondren Property should be reduced from $6,780,000.00 to $5,850,000.00, the amount actually realized from sale of the property in 2012.

Mr. Williams testified as to the sales process: On December 11, 2011, after TTC filed its chapter 11 case, TTC and Capital One entered into an Agreed Order where TTC was given until April 7, 2012 to obtain a qualified contract to sell the property. (Exhibit 32). The property was listed with a broker for sale at an initial price of $12,000,000.00. By the April 7, 2012 deadline,

the debtor had not obtained a qualified contract and the bankruptcy case was converted to chapter 7 on April 10, 2012.

On April 10, 2012, Mr. Williams was appointed trustee of TTC Plaza's chapter 7 case. On April 18, 2012, Mr. Williams filed a motion to sell the property to the highest qualified bidder at a purchase price of $6,125,000.00. (Exhibit 36). The purchaser's plan was to construct a five story 312 unit apartment complex on the property. Unfortunately, the Lake Vargos' Home Owners Association refused the purchaser's request for an ingress/egress to the property from Woodway Street. Mr. Williams testified that although this was not discovered until after a purchaser was identified, the ingress/egress problem existed on March 3, 2011. This required the purchaser to reduce the scope of its project, and ultimately caused a reduction in the final purchase price from $6,125,000.00 to $5,850,000.00. Mr. Williams testified that the $275,000.00 reduction was fair because the broker mistakenly misrepresented that the purchaser would have dual access to the property from Fondren Street and Woodway Street.

Mr. Williams relied on the following evidence to support his opinion that the value of the property was $5,850,000.00 on March 3, 2011: (i) the property was actively marketed by a broker for at least four months after the petition date and no higher qualified bids were received; (ii) the original purchase price obtained for the property was generally consistent with the tax appraisals for the years 2009 to 2011[4]; (iii) the final purchase price was reduced due to the homeowners association's rights which were not accounted for by tax appraisers or other interested bidders; (iv) the commercial real estate market in Houston was worse on March 3, 2011 than it was on the date of the sale, April 18, 2012. The Court credits Mr. Williams' testimony as to the value of the Fondren Property.

---

[4] The 2011 HCAD value for the Fondren Property was $6,213,506. The 2012 HCAD value for the Fondren Property was $5,313,521. (ECF No. 44 at 3).

The best evidence of the fair market value of the Fondren property as of March 3, 2011 is the $5,850,000.00 purchase price obtained for the property in 2012. *See In re Turnbow*, 121 B.R. 11, 13 (Bankr. S.D. Tex. 1990)( "If sold fairly, the purchase price is the best evidence of the fair market value of the property."). There was no evidence presented about the sales process that would lead this Court to believe that Mr. Williams did not obtain fair market value on the sale. Mr. Williams testified that he received assurances from the broker that all options with prospective buyers had been explored and that leaving the property on the market any longer would not have resulted in obtaining a higher purchase price. Mr. Williams also explained that he rejected a separate offer of $8,500,000.00 because it was not a qualified contract. The $8,500,000 purchaser requested a 120 day inspection period for due diligence even though a "qualified contract" limited due diligence period to 45 days. Mr. Williams stated that he made several attempts to negotiate with the proposed purchaser in order to obtain a qualified contract, but to no avail. In sum, the purchaser assumed no risk if it determined not to purchase the property.

The defendants did not present any evidence to suggest that there were any changes to the property or the real estate market that would have affected the fair market value of the property from March 3, 2011 to April 18, 2012. Nor did the defendants rebut Mr. Williams' testimony that the Woodway access issue existed on March 3, 2011. Accordingly, the Court finds that the fair market value of TTC's real property on March 3, 2011 was $5,850,000.00.

**2. New Vargo Accounts Receivable**

Mr. Williams proposed to eliminate the "New Vargo Accounts Receivable" asset valued at $835,784.86 because TTC never collected on this accounts receivable. Mr. Williams contends that this accounts receivable reflects the amount of past rent owed by New Vargo to TTC.

Based on the financial statements provided to the Court, it appears that TTC never collected on this accounts receivable. As of March 31, 2009, New Vargo was already

$471,543.26 behind on its rent obligations to TTC. The balance sheets show that this amount increased to $835,784.00 by March 30, 2011. (Exhibits 20 and 10). This asset was not listed on TTC's bankruptcy schedules when it filed its chapter 11 case on October 3, 2011. (Case No. 11-38381, ECF No. 1). Accordingly, as of March 3, 2011, TTC did not have any real prospect of collecting on this accounts receivable. The Court finds that the uncollectible "New Vargo Accounts Receivable" asset should be revalued to $0.00.

### 3. New Vargo Note Receivable

Mr. Williams also proposes to eliminate the "New Vargo Note Receivable" asset valued at $220,000.00 because TTC never collected on this note. Based on the financial statements provided to the Court, TTC never collected on this note. The March 31, 2009 balance sheet shows that the note receivable amount was at $220,000.00. The March 31, 2011 balance sheet shows that the "New Vargo Note Receivable" amount remained at $220,000.00. This asset was not listed on TTC's bankruptcy schedules when it filed its chapter 11 case on October 3, 2011. (Case No. 11-38381, ECF No. 1). No evidence was presented to suggest that there was any prospect of collecting on this note on March 3, 2011. Accordingly, the Court finds that the New Vargo Note Receivable had no value on March 3, 2011.

### 4. Sohani Note Receivable

Mr. Williams testified that the Sohani Note Receivable should be eliminated from the March 31, 2011 balance sheet. In connection with the sale of the Harwin Retail Center, TTC and Mr. Sohani executed a promissory note payable to TTC for $300,000.00. TTC settled the Sohani Note by accepting a lump sum payment of $193,000.00 from HBC on April 15, 2009. (Exhibit 6). At the time of the settlement, the note had a principal balance of $288,252.26. Even though TTC Plaza sold the note receivable on April 15, 2009, the March 31, 2011 balance sheet has it

listed as an asset worth $285,714.80. The Court agrees that the Sohani Note Receivable should be eliminated from the balance sheet.

### 5. Harwin Note Receivable

In connection with the sale of the Harwin Retail Center, TTC and HBC executed a promissory note payable to TTC for $790,000.00 on May 26, 2006. (Exhibit 1). According to Mr. Williams, on March 3, 2011, TTC agreed to sell the Harwin Note to Barney River and Zubee for $250,000.00, and TTC retained the option to repurchase the note at any time prior to March 1, 2012 for $420,000.00. The "Sale and Assignment of the Note & Liens" does not contain a purchase price but it does state that TTC retained the option to repurchase the Note at any time before March 1, 2012 for $420,000.00. (Exhibit 2 at 2). Barney River and Zubee contend that the purchase price of the Harwin Note was $360,000.00. No evidence was presented to support this contention. (ECF No. 44 at 3). Accordingly, the Court accepts Mr. Williams' testimony that the parties agreed on a purchase price of $250,000.00.

At the time of the sale, the note had a balance of approximately $730,582.79.[5] In the "Sale and Assignment of the Note," TTC represented that "the monthly payments through February 2011 [had] been timely paid." (Exhibit 2). This document also purports to transfer a lien against the Harwin Retail Center to secure repayment of the Note. (Exhibit 2 at 1). Based on these facts, it appears that TTC sold the Harwin Note at a substantial discount.

According to Barney River and Zubee, on May 22, 2012, Barney River and Zubee sold the Harwin Note to its maker for $525,000.00. (ECF No. 44 at 3). Although Mr. Williams testified that he never verified whether Barney River and Zubee subsequently sold the Note for $525,000.00, he did not present any evidence to rebut this contention. Accordingly, the best

---

[5] The March 31, 2009 balance sheet indicates that HBC owed $762,781.85 on the note and the March 31, 2011 balance sheet indicates that the balance of the loan was $730,582.79.

evidence shows that the Harwin Note was sold back to its maker for $525,000.00 on May 22, 2012.

The best evidence of the fair market value of the Harwin Note as of March 3, 2011 is the $525,000.00 purchase price that was paid for the note on May 22, 2012. The evidence suggests that the $250,000.00 purchase price it was sold for on March 3, 2011 was substantially less than the fair market value of the property. *See In re Brentwood Lexford Partners, LLC*, 292 B.R. 255, 268 (Bankr. N.D. Tex. 2003)("The court must determine the value of a going concern's property based on the current market, involving a prudent sale within a reasonable time…"). TTC appears to have sold the Note to the defendants while the company was in severe financial distress. Because TTC's sale of the note was probably not a "prudent sale within a reasonable time," the $250,000.00 purchase price it sold for does not reflect the fair market value of the note at the time of the challenged transfer.

Accordingly, the Court finds that the value of the Harwin Note should be reduced from $730,582.79 to $525,000.00[6] as of March 3, 2011.

### 6. Property Taxes (Accounts Payable)

Mr. Williams proposed that the amount TTC owed on accrued property taxes should be increased from $95,736.72 to $343,520.34.

Mr. Williams testified that the $343,520.34 amount listed in Exhibit 10 is the sum of claim numbers 3 and 4 filed by Tax Ease Funding, L.P. in TTC Plaza's bankruptcy case. (Exhibit 30). He further testified that the amount owed for claims 3 and 4 were for property taxes incurred before March 3, 2011. This testimony was not rebutted by the defendants.

---

[6] Even if the Court accepted the face value of the Harwin Note ($730,582.79) as the fair market value, TTC would still be insolvent at the time of the challenged transfer.

Accordingly, the Court finds that the accrued property taxes payable should be increased from $95,736.72 to $343,520.34.

**Summary of Adjustments**

The table below summarizes the Court's March 30, 2011 balance sheet adjustments:

| **Assets** | **Balance Sheet Value** | **Court's Value** | **Adjustment** |
|---|---|---|---|
| Fondren Property | $6,780,000.00 | $5,850,000.00 | ($930,000.00) |
| Harwin Bintliff N/R | $730,582.79 | $525,000.00 | ($205,582.79) |
| New Vargo A/R | $835,754.86 | $0.00 | ($835,754.86) |
| New Vargo N/R | $220,000.00 | $0.00 | ($220,000.00) |
| Mr. Sohani N/R | $285,714.80 | $0.00 | ($285,714.80) |
| *Undisputed assets*[7] | ($1,729,249.04) | ($1,729,249.04) | $0.00 |
| Total Assets | $7,122,803.41 | $4,645,750.96 | ($2,477,052.45) |
| | | | |
| **Liabilities** | | | |
| Accrued Taxes Payable | $95,736.72 | $343,520.34 | $247,783.62 |
| Undisputed Liabilities | $4,665,881.03 | $4,665,881.03 | |
| Total Liabilities | $4,761,617.75 | $5,009,401.37 | $247,783.62 |
| | | | |
| **Assets minus Liabilities** | $2,361,185.66 | **($363,650.41)** | ($2,724,836.07) |

The table shows that TTC was balance sheet insolvent at the time of the challenged transfer. After making the proper adjustments, TTC's liabilities exceeded its assets by $363,650.41 on March 3, 2011.

**Sale of the Harwin Note**

TTC's sale of the Harwin Note to Barney River and Zubee rendered TTC even more insolvent. At trial, Mr. Williams testified that the Harwin Note Receivable should have been removed from TTC's March 31, 2011 balance sheet because the Note had already been sold to Barney River and Zubee on March 3, 2011. He claims that $97,000.00 of the $250,000.00

---

[7] This is the sum of the remaining (undisputed) assets listed on the March 31, 2011 balance sheet. *See* Exhibit 10.

12 / 14

purchase price was actually paid to TTC, $100,000.00 of it was transferred to Capital One, and that the remaining $53,000.00 was diverted to Wu or a Wu-controlled entity.

The Court credits Mr. Williams' testimony and finds that three adjustments to the March 31, 2011 balance sheet should be made to account for the sale of the Harwin Note: (i) remove the Harwin Note Receivable; (ii) increase the checking/savings account by $97,000.00 for consideration actually received; and (iii) record an accounts receivable owed by Wu for $53,000.00.

The December 31, 2010 balance sheet shows that TTC owed $4,762,849.42 on the note payable to Capital One. The March 31, 2011 balance sheet shows that TTC owed $4,662,849.42 on the Capital One Note Payable. (Exhibit 10 and 14). Accordingly, it appears that the March 31, 2011 balance sheet already accounts for $100,000.00 of the consideration received from sale of the Harwin Note by reducing TTC's long term debt by $100,000.00.

The table below summarizes the Court's balance sheet adjustments after accounting for the sale of the Harwin Note:

| Assets | Balance Sheet Value | Court's Value | Adjustment |
|---|---|---|---|
| Fondren Property | $6,780,000.00 | $5,850,000.00 | ($930,000.00) |
| *Harwin Bintliff N/R* | $730,582.79 | $0.00 | ($730,582.79) |
| *Checking/Savings* | ($255.37) | $96,744.63 | $97,000.00 |
| *Wu A/R* | $0.00 | $53,000.00 | $53,000.00 |
| New Vargo A/R | $835,784.86 | $0.00 | ($835,784.86) |
| New Vargo N/R | $220,000.00 | $0.00 | ($220,000.00) |
| Mr. Sohani N/R | $285,714.80 | $0.00 | ($285,714.80) |
| *Undisputed Assets* | ($1,729,023.67) | ($1,729,023.67) | $0.00 |
| Total Assets | $7,122,803.41 | $4,270,720.96 | ($2,852,082.45) |
| | | | |
| **Liabilities** | | | |
| Accrued Taxes Payable | $95,736.72 | $343,520.34 | $247,783.62 |
| Undisputed Liabilities | $4,665,881.03 | $4,665,881.03 | $0.00 |
| Total Liabilities | $4,761,617.75 | $5,009,401.37 | $247,783.62 |
| | | | |
| **Assets minus Liabilities** | $2,361,185.66 | **($738,680.41)** | ($3,099,866.07) |

TTC became even more balance sheet insolvent as a result of the challenged transfer. After making the appropriate adjustments to the March 31, 2011 balance sheet, TTC's liabilities exceeded its assets by $738,680.41 on March 3, 2011.

Accordingly, TTC Plaza was balance sheet insolvent at the time of the March 3, 2011 transfer and became even more insolvent as a result of the transfer.

## Conclusion

The Court will conduct a trial on whether the transfer is avoidable on August 4, 2014 at 9:00 am.

SIGNED **July 7, 2014.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE